IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
SPRINGFIELD DIVISION

CENTRAL ILLINOIS CARPENTERS )
HEALTH & WELFARE TRUST )
FUND, et al., )
)
    Plaintiffs, )
)
    v. )      NO. 13-3283
)
GEORGE WEIS COMPANY, )
)
    Defendant. )

<u>OPINION</u>

RICHARD MILLS, U.S. District Judge:

This is a fringe benefit collection case pursuant to the Employee

Retirement Income Security Act of 1974 ("ERISA"), as amended, 29 U.S.C.

§ 1002(1), (3), 1132 and 1145.  Pending is the Plaintiffs' Motion for

Summary Judgment.

## I. INTRODUCTION

The Plaintiffs conducted audits of the Defendant from October 1,

2009 to June 30, 2011.  Defendant George Weis Company claims it had

a signed Collective Bargaining Agreement (CBA) only with the St. Louis

Union which covers St. Louis, Missouri and Southern Illinois, not with the Mid-Central Region or Local 725. It contends the audit in question in this case is for projects done within the geographical territory of Local 725. The Plaintiffs disagree and seek the entry of summary judgment and an award of $51,591.73, as well as their attorney's fees and costs, as provided by ERISA.

## II. FACTUAL BACKGROUND

### (A)

Plaintiffs Central Illinois Carpenters Health and Welfare Trust Fund ("Welfare Fund"), Carpenters Pension Fund of Illinois ("Pension Fund") and Carpenters Retirement Savings Fund of Illinois ("Retirement Savings Fund") are employee benefit plans and multi-employer plans within the meaning of Sections 3(1) and (3), 502 and 515 of ERISA.

The Welfare Fund maintains its place of business in Lincoln, Illinois. The Pension Fund and Retirement Savings Fund maintain their places of business in Geneva, Illinois.

The Pension and Retirement Savings Funds have been authorized to

act as an agent in the collection of contributions due to Plaintiffs Mid-Central Illinois Regional Council of Carpenters – Joint Apprenticeship & Training Committee ("Training Fund"); Mid-Central Illinois Regional Council of Carpenters, Central Illinois Builders, Carpenters International Training Fund, Carpenters Labor Management Education & Development Fund ("Development Fund"); Mid-Central Illinois Regional Council of Carpenters Promotions Fund ("Promotions Fund"); Mid-Central Illinois Joint Labor Management Substance Abuse Testing & Assistance Fund ("Substance Abuse Fund"); and Carpenters Local 270 ("Local 270").

Mike Weis, the Defendant's Vice President, has been a Trustee of the Pension Fund for at least ten years.  The Defendant has had a CBA with the St. Louis District Council, or its predecessor in Illinois, for at least 40 years.

Until June of 1999, the Defendant had an "International Agreement" with the United Brotherhood of Carpenters and Joiners of America ("UBC").  The Defendant did not renew (or terminated) the "International Agreement" in 1999.

The Plaintiffs allege Mike Weis signed a Participation Agreement with the Mid-Central Illinois District Council of Carpenters Health, Welfare and Pension Funds ("MCIRCC") on or about September 3, 1992. The Defendant alleges the 1992 Participation Agreement was with the Geneva Welfare and Pension Funds which were disbanded after 1992. The exhibit attached to the Plaintiffs' Motion establishes that the Participation Agreement was with the MCIRCC. The Plaintiffs state the entity's name was changed in 2002, though the legal entity is the same. Regardless of the dispute over the name, the Defendant asserts it terminated the Participation Agreement on June 10, 1998.

Mike Weis does not recall ever having been asked to sign a CBA with the MCIRCC. A Participation Agreement dated September 3, 1992 bears the signature of someone purporting to be Michael Weis, Vice President, as employer representative for George Weis Co. The entity listed at the top of the document is "Mid-Central Illinois District Council of Carpenters Health, Welfare and Pension Trust Funds (Trust Funds)." The Defendant further asserts it never signed a CBA with Mid-Central Region or Local 725

4

or its replacement, Local 270.

The Plaintiffs allege the Defendant sent a letter to "Health/Welfare – Pension Carpenters H&W Pension Fund" on June 10, 1998. The Defendant alleges the letter was sent to the Geneva Pension and Welfare Funds, which were subsequently disbanded. The June 10, 1998 letter states, "George Weis Company has terminated the existing collective bargaining agreement with the Union effective July 31, 1998 under which contributions were made to the Fund." The Plaintiffs allege the purpose for sending the June 10, 1998 letter was to terminate the Participation Agreement. The Defendant contends it was to terminate the Participation Agreement with the Geneva Pension and Welfare Funds even though, according to the Plaintiffs, the name was not changed until 2002.

The Defendant has employed members from MCIRCC on projects within the jurisdiction of MCIRCC. The Plaintiffs note that Weis testified, when the Defendant needs employees from MCIRCC locals, "our foreman on the job usually calls the union hall that he's going to start work on a certain project within that jurisdiction." The Defendant asserts the above

quote is incomplete.  The Defendant first contacted, in 2004 and in 2009, the business representative for Local 725, the Trustee for the Pension Fund and the former Trustee for the Geneva Welfare Funds, Scott Snow, who instructed the Defendant to pay fringe benefits and wages for the members of the St. Louis Union at the St. Louis Union CBA rates and to pay fringe benefits and wages for the Defendant's employees who were members of Local 725 at the rate specified in the Mid-Central CBA.  The fringe benefits for the St. Louis Union members were to be paid directly to the St. Louis Union and its funds.  Mike Weis testified, "Mid-Central always asks us to have one of their own people from Mid-Central, one of their members to work alongside ours."

The Plaintiffs allege that Defendant knows the correct wage and benefit rates on the basis of a "scope letter" which "would have been sent to us which designates the wage rates and contributions which was then likely sent to us by Mid-Central, their district office."  Moreover, the Defendant paid contributions to the Plaintiff Funds and MCIRCC on the "basis of" the "Scope Letter," which "designates the wages and

contributions" to be paid.  The Defendant partially disputes the foregoing assertions and states that fringe benefits for members of the St. Louis Union working within the jurisdiction of Mid-Central Region were paid on the basis of Scott Snow's letter of May 12, 2004, his conversation with Karin Ireland and Ronald Mense during 2009 and Mense's Memorandum of his 2009 conversation with Snow.  Ronald Mense was the Defendant's carpenter foreman.  Karin Ireland was its payroll clerk.

Mike Weis testified that at a minimum, the Defendant performed work on a Jack in the Box in Litchfield in 2004, on a hospital in Carlinville in 2009 and on a hospital in Carlinville in approximately 2011.  Although not directly relevant to the audit at issue between October 1, 2009 and June 30, 2011, the Defendant had a project in Hillsboro, Illinois in 2013 and 2014.  Weis further testified that Defendant paid contributions after the purported attempts to terminate a CBA and/or Participation Agreement in 1998.

The Defendant paid contributions to the Welfare Fund, Pension Fund and Retirement Savings Fund between the purported termination in June

of 1998 and February of 2012, when the Defendant sent a second letter intending to terminate the CBA and/or participation agreement.   The Defendant paid contributions to the Welfare Fund, Pension Fund and Retirement Savings Fund and dues during the period covered by the audit. The Defendant has reported and paid contributions to the Welfare Fund, Pension Fund and Retirement Savings Fund as recently as January of 2014.

(B)

Scott Snow, the Union Business Agent at the time, sent a fax to the Defendant on or about May 12, 2014 including a Wage Addendum, remittance report and "Dues Check Off Only" form.  The Defendant alleges Snow also had a telephone conversation with Karen Ireland at that time instructing the Defendant to pay fringe benefits directly to the St. Louis Union and its funds, for its employees who were members of the St. Louis Union at the rates specified in the St. Louis CBA.  The "Dues Check Off Only" form was only to be used to report the Defendant's St. Louis employees.

The Defendant paid dues on behalf of St. Louis employees performing

work in the MCIRCC jurisdiction.  The Defendant alleges that Plaintiffs are attempting to overcharge the Defendant $2,296.61 for the dues it has already paid Local 725 for members of the St. Louis Union for the period from 2009 to 2011.

The Defendant contacted Local 725 "and asked them for the wage addendum . . .  which spells out the rates, benefits, and so on how their carpenters got paid and what amounts they're supposed to be paid."  The Defendant claims it asked Scott Snow how the fringe benefit rates were to be determined and to whom the fringe benefits were to be paid for employees who were members of the St. Louis Union and members of Local 725, Mid-Central Region.  Mike Weis testified that his understanding, based upon the May 12, 2004 fax, was "that the St. Louis Carpenter District Council employees were to be paid at the same rate as their home fund, as the St. Louis District Council Collective Bargaining Agreement, with the exception that union dues were supposed to be paid into the Mid-Central District Council."  Weis did not have a conversation with Snow regarding the meaning of the fax.

Scott Snow never received anything from the Defendant in 2004 disputing the existence of a CBA.  The Defendant claims this is because it had no obligation to inform Snow of the non-existing CBAs.

The Defendant states the May 12, 2004 fax applied to the Jack-in-the-Box Project, which also took place in the Mid-Central jurisdiction.  The Defendant further asserts that in 2009, Scott Snow instructed the Defendant to use the same arrangement and to pay as it normally would the St. Louis Union for its employees who are members of the St. Louis Union for work on the Carlinville Hospital Project.

The Plaintiffs audited the Defendant's records for the time periods of October 1, 2009 through June 30, 2011, in order to determine whether the Defendant was in compliance with its obligations to make payments of all contributions required under the CBA.  The Defendant disputes that the purpose was to determine its compliance.  It contends there was no CBA or Trust Agreement between the Defendant and Local 725 or with Mid-Central Region or with any of the Plaintiff funds.

The hours reported in a document entitled "Revised Statement of

10

Additional Hours Due for George Weis Company on Behalf of the Geneva Pension and Retirement Savings Funds of Illinois for the Period of October 1, 2009 through June 30, 2011" ("Pension and Retirement Savings Fund Audit Report") and a "Revised Statement of Additional Hours Due for George Weis Company on Behalf of the Central Illinois Carpenters Health & Welfare Fund Trust Fund" ("Welfare Fund Audit Report") over the same period are both correct. The Defendant claims it paid all fringe benefits for those hours at the rates specified in the St. Louis Union CBA, and the Plaintiffs are attempting to overcharge it based on a CBA that Defendant did not sign.

The Welfare Fund Audit Report shows $23,596.28 in liability due to the Welfare Fund and certain other funds on behalf of which the Welfare Fund acts as collection agent, comprised of $14,875.92 in contributions due; $4,658.72 in interest; $2,975.25 in Liquidated Damages; and $1,086.39 in total examination costs. The Pension and Retirement Savings Fund Audit Report resulted in a finding of a combined $18,607.53 due in contributions; $6,440.76 due in interest; $1,860.76 due in Liquidated

11

Damages; and $1,086.40 due in total examination costs, for a total due of $27,995.45. The Defendant disputes the correctness of both audits.

The Plaintiffs allege that the sole basis of the Defendant's dispute as to the audit liability was that "Scott Snow amend[ed] their agreement [meaning the Mid-Central Agreement. . .]." However, the Defendant asserts there are other reasons for its dispute, including its claim that it did not sign any CBA with the Mid-Central Region or Local 725 or Local 270.

Scott Snow testified that the rate paid ". . . would have to be the same, as the addendum says, for everybody." Snow also testified that he could not dispute the testimony of Karen Ireland and Ronald Mense and he could not recall the contents in the memorandum Ronald Mense prepared with respect to the 2009 conversation at the beginning of the Carlinville Hospital Project. He was unable to recall the particulars of those conversations.

The Wage Addendum provided with the May 12, 2004 fax purports to cover "all Carpenter work performed in the jurisdiction of Local 725." It also instructed that all benefits on the two regular company employees

be reported back to their home fringe benefit funds, but dues for the St. Louis Union members are to be paid to Local 725.  Scott Snow testified that the phrase "which covers all Carpenter work" referred to the Wage Addendum, report forms and the "Dues Check Off Only" report.

The Plaintiffs allege the "Carpenters Welfare, Pension and Retirement Savings Funds of Illinois" Remittance Report provided with the May 12, 2004 fax contains the following language in a box at the top of the page:

> The undersigned employer, if not already a signator [sic], hereby becomes a signatory party to the currently applicable collective bargaining agreement with the District Council or Local of the Union covering the type and area of work of the listed employees and also to each agreement and Declaration of Trust, and amendments, establishing the fund for which payment is made herewith.

The Defendant claims that the form on which the above language appears was to be used only for reporting fringe benefits for the employees who are members of Local 725.  A similar paragraph does not appear on the form for the Defendant to report the dues payments for its employees who are members of the St. Louis Union.  Moreover, the form containing the above language was signed only by Karen Ireland, who is a payroll clerk and does

13

not have authority to enter into any agreements or collective bargaining agreements on behalf of the Defendant.

The Plaintiffs allege it was "not within [Scott Snow's] power" to modify the rates at which employers are required to contribute to the Funds.  The Defendant disputes this statement as argumentative because it assumes there was a CBA requiring the Defendant to pay fringe benefits for its employees who are members of the St. Louis Union at the rate specified in the Mid-Central Region CBA, which the Defendant did not sign.  There was no CBA to modify.

Although the Plaintiffs allege that Scott Snow never told a contractor he or she could pay less than the established MCIRCC rates for work performed in the jurisdiction of MCIRCC, the Defendant disputes the allegations based on the statements of Michael Weis, Ronald Mense and Karen Ireland and the testimony of Scott Snow, wherein Snow stated he could not recall the specifics of those conversations.

Mike Weis could not identify language in the May 12, 2004 fax stating that "St. Louis rates are to be paid" to St. Louis employees when

14

they work in the Mid-Central jurisdiction.  Weis stated, "I guess Scott kind of insinuated that those people we pay according to their - - the St. Louis collective bargaining agreement, and their members would be paid according to his agreement."  When asked if he ever followed up with Scott Snow regarding the rates for St. Louis employees, Weis testified that he did not know of any "specific conversation."

The Plaintiffs allege that in an August 21, 2012 letter, Mike Weis admitted "[a]s a Trustee of the Fund I can logically see" that Scott Snow could not amend the CBA.  The Defendant disputes this allegation and claims the letter was part of settlement negotiations.  It further asserts there was no CBA for Scott Snow to change because the Defendant did not enter in to a CBA with Mid-Central Region or Local 725 or Local 270 and its agreement with the International Union terminated in 1999.  Additionally, the Defendant's only CBA for the period covered by the audit is its CBA with the St. Louis Union and the Defendant paid fringe benefits for its employees who were members of the St. Louis Union at the rates specified in the St. Louis CBA to the St. Louis Union and its funds pursuant to oral

and written instructions from Snow.

(C)

The Plaintiffs have moved for summary judgment.  The only issue is whether the Defendant is obligated to pay contributions to the Plaintiff Funds on behalf of its St. Louis employees who were employed for the Carlinville Hospital Project at rates specified in the Mid-Central CBA (in the geographic territory of Local 725, where the work was performed), instead of the St. Louis Union CBA.

The Plaintiffs assert the Defendant must make contributions on behalf of its St. Louis employees at the applicable MCIRCC rates when employees work in the Mid-Central's jurisdiction.  Based on the revised audits conducted for the period of October 1, 2009 through June 30, 2011, the Plaintiffs are seeking an award of $51,591.73 in contributions due, interest, liquidated damages and audit costs, and for $28,098.16 in their attorney's fees and costs.

The Defendant claims that Scott Snow, the Business Representative for Local 725, advised its representatives that the same arrangement that

was used with respect to the Jack-in-the-Box Project in May of 2004 should be used in 2009 for the Carlinville Hospital Project. Defendant George Weis Company states it made payments directly to the St. Louis Union and its funds in 2004 and between October 1, 2009 to June 30, 2011. The Defendant contends that summary judgment should be denied because, at the very least, there are genuine issues of material fact on this issue.

## III. DISCUSSION

### A. Legal standard

Summary judgment is appropriate if the motion is properly supported and "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." See Fed. R. Civ. P. 56(a). The Court construes all inferences in favor of the non-movant. See Siliven v. Indiana Dept. of Child Services, 635 F.3d 921, 925 (7th Cir. 2011). To create a genuine factual dispute, however, any such inference must be based on something more than "speculation or conjecture." See Harper v. C.R. England, Inc., 687 F.3d 297, 306 (7th Cir. 2012) (citation omitted). Because summary judgment "is the put up or shut up moment in a lawsuit,"

a "hunch" about the opposing party's motives is not enough to withstand a properly supported motion.  See Springer v. Durflinger, 518 F.3d 479, 484 (7th Cir. 2008).  Ultimately, there must be enough evidence in favor of the non-movant to permit a jury to return a verdict in its favor.  See id.

B. Requirements of ERISA

Section 515 of ERISA provides:

> Every employer who is obligated to make contributions to a multiemployer plan under the terms of the plan or under the terms of a collectively bargained agreement shall, to the extent not inconsistent with law, make such contributions in accordance with the terms and conditions of such plan or such agreement.

29 U.S.C. § 1145.  Section 402(a)(1) provides in part: "Every employee benefit plan shall be established and maintained pursuant to a written instrument."  29 U.S.C. § 1102(a)(1).

Although § 515 of ERISA refers to "the plan" or a "collectively bargained agreement," the obligation to contribute does not "depend on the existence of a valid collective bargaining agreement."  See Central States, Southeast and Southwest Areas Pension Fund v. Gerber Truck Service, Inc., 870 F.2d 1148, 1153 (7th Cir. 1989).  "As long as the agreement is

18

written," it does not need to follow the usual formalities.  See Line Const.

Ben. Fund v. Allied Elec. Contractors, Inc., 591 F.3d 576, 581 (7th Cir.

2010).  Even an unsigned agreement can be enough to bind the employer,

as long as its terms are sufficiently detailed.  See id.

### C. Nature of Agreements and whether there was termination

(1)

Mike Weis signed a Participation Agreement in September of 1992

with Mid-Central Illinois District Council of Carpenters Health, Welfare

and Pension Trust Funds.  It provided:

> WHEREAS, the undersigned Employer agrees to make required hourly contributions to applicable Trust Funds for the purpose of providing health, welfare and pension benefits for eligible Employees and their dependents, and to continue making such contributions while employing Employees performing work of a carpenter in the geographical area under the jurisdiction of the Mid-Central Illinois Council of Carpenters.

> NOW THEREFORE, for and in consideration of benefits to be derived and other good and valuable considerations, receipt, which is hereby acknowledged, the undersigned Employer hereby (1) subscribes to all applicable provisions of all Trust Funds in affect at this time within the geographical jurisdiction of the Mid-Central Illinois District Council of Carpenters, and agrees to be bound thereby, and by any

amendments thereto; (2) authorizes said parties to name Trustees and successor Trustees to administer the Trust Fund; (3) agrees to be bound by the rules and regulations adopted by the Trustees; and (4) accepts the Welfare and Pension Plan adopted by the Trustees for eligible Employees.

The Defendant did not sign a CBA with the Mid-Central Region, Local 725 or its replacement, Local 270, at any time.  In June of 1998, Mike Weis sent a letter to the Carpenters Health & Welfare Pension Fund in Geneva, Illinois, purporting to terminate the Participation Agreement effective on July 31, 1998.  A copy of the notice was sent to the Federal Mediation and Conciliation Service.

The Plaintiffs allege that the Defendant's purported termination of the Participation Agreement did not comply with the explicit terms of 29 U.S.C. § 158(d).  Because § 158(d) applies to employers, employees and labor organizations and not to employee benefit plans and multi-employer plans within the meaning of the applicable provisions of ERISA, however, § 158(d) does not provide the appropriate procedure for terminating a Participation Agreement.

The question thus becomes what steps are necessary in order to

terminate a participation agreement.  The Plaintiffs cite cases which hold that the particular language of the agreement governs how it can be terminated.  The Participation Agreement here does not contain any such language.  Accordingly, the Plaintiffs contend that it cannot be terminated and, pursuant to the Participation Agreement, the Defendant is obligated "to continue making such contributions while employing Employees performing work of a carpenter in the geographical area under the jurisdiction of the Mid-Central Illinois District Council of Carpenters." Although that is a plausible interpretation of the Participation Agreement, the Court concludes it could also be argued that even though it does not specifically address termination, the Participation Agreement still might be terminated by sending a letter expressing an intent to terminate.

Additionally, while it is true that the language of the Participation Agreement does not specifically address how or if it can be terminated, it also does not explicitly provide that Defendant is obligated to pay fringe benefit contributions for employees who are members of the St. Louis Union at the rates specified in the Mid-Central CBA.  It is plausible that

21

the Agreement does not account for every contingency. The Court concludes there is a factual dispute regarding whether the Defendant's purported termination was effective.

(2)

The Plaintiffs further state that the Remittance Report provided to the Defendant in a May 12, 2004 fax includes language binding the Defendant to both "the currently applicable collective bargaining agreement" and "to each agreement and Declaration of Trust, and amendments establishing the funds for which payment is made herewith." Additionally the Remittance Reports, which were submitted by the Defendant to the Pension and Retirement Savings Fund throughout the period of the audits, contain the same language. The Plaintiffs contend the Participation Agreement is not terminable and, even if it was, the Defendant has continued to renew the Participation Agreement and has adopted the Mid-Central CBA any time it has employed carpenters in the applicable geographic area. The Plaintiffs thus allege the Defendant should be estopped from denying it is a signatory contractor with MCIRCC and,

as a result, is obligated to pay fringe benefit contributions to the Plaintiff Funds due on behalf of all employees working in the jurisdiction.

The Defendant states that, in addition to the 1998 letter terminating the Participation Agreement, Scott Snow testified that the Geneva Welfare and Pension Plans that existed in 1992 were disbanded.  The Geneva Welfare and Pension Funds have never complained about the termination. Moreover, according to Ronald Mense's Affidavit, Scott Snow in 2009 instructed the Defendant to pay dues, wages and fringe benefits in the same fashion as it had in the past–it would pay dues for the St. Louis members to the Mid-Central Union and would pay fringe benefits at the St. Louis rate, for the St. Louis Union members, directly to the St. Louis Union and its funds.  The Defendant claims that a computer program requires the Defendant to pay at the St. Louis CBA rates.

Scott Snow, the Union Business Manager, testified he could not dispute Mense's account as to how the payments were to be made. Additionally, Snow stated he could not dispute Karen Ireland's testimony that he instructed her to make the payments for the St. Louis Union

members directly to the St. Louis Union and its funds in the same fashion that had been done before which, according to Ireland's affidavit, was that wages and fringe benefits for employees who were members of the St. Louis Union would be paid pursuant to the terms of the St. Louis CBA.  The Defendant states it has complied with that direction by paying the rates for the St. Louis Union members at the rate specified in the St. Louis CBA.

The Plaintiffs further assert that the Scope Letters were "Written Agreements" which would have designated the wage rates and contributions.  These would have been the applicable MCIRCC rates.  Mike Weis testified such a letter designating the wage rates and contributions would likely have been sent by Mid-Central, the district office.  The Mid-Central CBA requires employers to:

> pay all fringe benefits and check offs and deductions on all Employees into the respective Fringe Benefit Funds in the jurisdiction of each Local Union within the Regional Council in which the Employer has been working.

The Plaintiffs contend there is no distinction between the Defendant's employees under the Mid-Central CBA and no mechanism for the Defendant to bring employees in from another area and pay anything other

than the applicable CBA rates.  The Defendant contends that, as with the Jack-in-the-Box project in 2004, it did as it was directed between 2009 and 2011 by paying the rates specified in the St. Louis Union CBA.

Although Scott Snow testified the rates would have to be the same for "everybody" and that he was not authorized to modify the rates at which employers were required to contribute, Snow also stated that he could not dispute differing accounts regarding the uniformity of rates.  The Plaintiffs question the Defendant's position that if there was no CBA, as Mike Weis's June 12, 2012 letter suggests, then it is unclear what the Defendant means by alleging that Scott Snow amended the agreement in a May 12, 2004 and verbally to two different employees.  The Defendant claims there are at minimum disputed facts as to both issues–whether the Participation Agreement was terminated and whether the rates at which the Defendant was directed to pay fringe benefits for St. Louis Union members.

The Defendant further alleges that it paid fringe benefits for its employees who were members of the St. Louis Union for the Jack-in-the-Box Project which began in 2004, at the rates specified in the St. Louis

25

CBA.

(3)

The testimony of Scott Snow that he was not authorized to modify the rates at which employers were required to contribute is persuasive.  It might be surprising if a union business agent had such authority.  Additionally, Snow's testimony that the rates would have to be the same for "everybody" seems logical and persuasive.

Based on the record, however, the Court concludes there are factual disputes.  Given the accounts of Ronald Mense and Karen Ireland and the testimony of Scott Snow, there is a factual issue as to the appropriate fringe benefit rates for members of the St. Louis Union.  Additionally, if in 2004 the Defendant made fringe benefit payments for its employees who were members of the St. Louis Union for the Jack-in-the-Box Project at the rates specified in the St. Louis Union CBA and, if the Defendant's representative was told in 2009 to make the payments in the same manner, then there is a factual dispute regarding whether the Defendant made the "contributions in accordance with the terms and conditions of such plan or such

agreement," pursuant to § 515 of ERISA.

Based on the foregoing, the Court concludes there are factual disputes which preclude the entry of summary judgment in favor of the Plaintiffs.

<u>Ergo</u>, the Plaintiffs' Motion for Summary Judgment [d/e 9] is DENIED.

The Plaintiffs' Motion to Strike the Defendant's Response to the Summary Judgment Motion [d/e 12] is DENIED.

The final pretrial conference set for January 4, 2016 at 2:00 p.m. is reset for December 16, 2015 at 2:00 p.m., at which time a firm trial date will be set.

ENTER: September 30, 2015

FOR THE COURT:

s/Richard Mills
Richard Mills
United States District Judge